

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-11-2008

# Natl Taxpayers Union v. HHS

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3381

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Natl Taxpayers Union v. HHS" (2008). *2008 Decisions.* Paper 126.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/126

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-3381

_____

NATIONAL TAXPAYERS UNION

Petitioner

v.

UNITED STATES SOCIAL SECURITY ADMINISTRATION;
OFFICE OF THE INSPECTOR GENERAL

Respondent

_____

Petition for Review of Final Decision of
Commissioner of Social Security Administration
(HHS-1:07-43)

Argued November 20, 2008

_____

Before: FUENTES, HARDIMAN, and GARTH, Circuit Judges.
(Filed:  December 11, 2008)

Michael Geltner                    **[ARGUED]**
Geltner & Associates
105 North Virginia Avenue
Suite 305
Falls Church, VA 22046
*Counsel for Petitioner*


Nicholas J. Bagley                 **[ARGUED]**
Mark B. Stern
United States Department of Justice
950 Pennsylvania Avenue, N.W.
601 D Street, N.W.

Washington, DC 20530
*Counsel for Respondent*

---

OPINION OF THE COURT

---

FUENTES, <u>Circuit Judge</u>:

The National Taxpayers Union ("NTU") petitions for review of a decision of the Department of Health and Human Services Departmental Appeals Board that upheld a determination by an administrative law judge ("ALJ") who found that NTU mailed correspondence that used "social security" in a manner that violated Section 1140 of the Social Security Act, 42 U.S.C. § 1320b-10. The Appeals Board also affirmed the ALJ's imposition of a civil penalty of $274,582 against NTU. Because we find that Section 1140(a)(1) is neither unconstitutional as-applied, nor unconstitutionally overbroad, and that the ALJ's decision is supported by substantial evidence, we deny the petition for review.[1]

## I. Facts

NTU is a not-for-profit taxpayer advocacy organization. In 2001, NTU sent thousands of direct mail pieces to consumers to solicit donations. The brochures included language in large, red, bold type that stated, "Official National Survey on Social Security." The brochures also included the statement that it was "commissioned by the NTU for the Social Security Administration, White House, and Congress of the United

---

[1]  We have jurisdiction pursuant to 42 U.S.C. § 1320a-7a(e).

States."  The Social Security Administration ("SSA") received a complaint, and the Inspector General of the SSA determined that the mailing violated Section 1140 of the Social Security Act.  Section 1140 prohibits the use of nineteen phrases, including "social security," in a manner that either (1) the writer knows or should know, or  (2) the reader could reasonably perceive as conveying the false impression of official endorsement of the material by the SSA or the government.  The Inspector General sent a cease-and-desist letter to NTU, and NTU responded with an apology.  SSA subsequently received an additional complaint, and determined that the basis of the new complaint was a slightly altered version of the same brochure which NTU mailed after the cease-and-desist letter.  The SSA Inspector General sent another letter to NTU, demanding that NTU provide written confirmation of its intent to comply with Section 1140 within ten days.  Instead of complying, NTU filed a lawsuit in United States District Court, claiming that Section 1140 was unconstitutional.[2]  While the action was pending, NTU mailed a third version of the brochure, which SSA also considered misleading and in violation of Section 1140.

The SSA Inspector General wrote NTU, stating that it planned to impose a penalty in the amount of $274,582, or $.50 per offending direct mail piece.[3]  NTU requested a

---

[2]The District Court ultimately dismissed NTU's complaint, and the Fourth Circuit affirmed.

[3] The statute provides for a "civil money penalty not to exceed . . . $5,000" for each piece of mail that contains the prohibited language.  42 U.S.C. § 1320b-10(b)(1).

3

hearing in front of an ALJ, who found that NTU violated both prongs of Section 1140. Specifically, the ALJ found that NTU knew that the language used in the brochures would induce recipients to read it because the language conveyed the false impression that the SSA authorized the mailing. Similarly, the ALJ found that recipients could reasonably interpret the language on the brochure as conveying the false impression that the SSA authorized the mailing. Finally, the ALJ found that the proposed penalty was reasonable. NTU appealed the ALJ's decision to the Appeals Board of the Department of Health and Human Services, which refused to review the decision, thereby adopting the ALJ's decision as final. NTU petitions this Court for review of the agency's final decision.

In its petition for review, NTU asserts several arguments. First, NTU challenges the constitutionality of Section 1140, arguing that it violates NTU's First Amendment rights as-applied, and that it is facially overbroad. Second, NTU argues that the monetary penalty imposed is "criminal in nature" and that it is "excessive" and prohibited by the Eighth Amendment. Finally, NTU urges this Court to apply <u>Daubert</u> principles to administrative proceedings and to strike the expert testimony from the ALJ proceeding.

## II. Discussion

A.    First Amendment[4]

---

[4]We review NTU's constitutional claims de novo. <u>See, e.g.</u>, <u>CBS Corp. v. FCC</u>, 535 F.3d 167, 174 (3d Cir. 2008).

1. *As-Applied Challenge*

NTU first argues that Section 1140 violates the First Amendment as-applied because such application penalizes the organization's speech without finding "actual intent to defraud." In other words, according to NTU, government may not limit speech unless that speech intends to defraud or deceive the reader or listener. This assertion requires little analysis, because it is based on an incorrect reading of Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620 (1980). Contrary to NTU's assertions, Village of Schaumburg acknowledged that a "direct and substantial limitation on protected activity" is constitutional if "it serves a sufficiently strong, subordinating interest." Id. at 636. Here, the government has a substantial interest in protecting Social Security recipients from deceptive mailings. For millions of Americans, Social Security is a vital, if not their only, source of income. Mail that appears to be from the SSA piques beneficiaries' interest and induces them to read and respond accordingly. Congress enacted Section 1140 to protect seniors and other beneficiaries from fraud, and to ensure that when the SSA sends legitimate mail to beneficiaries, the recipients will open it and not perceive it as "junk mail." HOUSE COMM. ON WAYS AND MEANS, 102D CONG., REPORT ON DECEPTIVE SOLICITATIONS 5 (Comm. Print 1992). Section 1140 requires only that charities refrain from using deceptive language when soliciting. Therefore, Section 1140 is constitutional as-applied because it serves a "strong, subordinating interest."

## 2. *Facially Overbroad*

Section 1140 regulates two types of conduct. The first type of conduct relates to the intentions of the speaker. This prong states that a speaker cannot use nineteen phrases, including "social security," "in a manner which such person knows or should know would convey . . . the false impression that such item is approved, endorsed or authorized by" SSA. 42 U.S.C. § 1320b-10(a). The second type of conduct is objective with regard to the reader, and prohibits the use of the proscribed phrases "in a manner which reasonably could be interpreted or construed as conveying the false impression that such item is approved, endorsed or authorized" by SSA. Id. Both prongs also cover communications that convey the false impression that the author has "some connection with the SSA." Id.

This Court has held that it will strike down a regulation of speech on its face "if its prohibitions are sufficiently overbroad–that is, if it reaches too much expression that is protected by the Constitution." DeJohn v. Temple Univ., 537 F.3d 301, 314 (3d Cir. 2008). In other words, this Court must find that the very existence of the regulation at issue "will inhibit free expression to a substantial extent." Id. (quotation marks omitted) (emphasis added); see also Ashcroft v. Free Speech Coalition, 535 U.S. 234, 246-44 (2002) (invalidating the Child Pornography Prevention Act as facially overbroad because the statute reached a "substantial" amount of protected speech, such as speech that neither appealed to the prurient interest nor was patently offensive, including speech that had

6

serious "literary, artistic, political, and scientific value"); Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973) ("[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."); 181 South Inc. v. Fischer, 454 F.3d 228, 235 (3d Cir. 2006) ("The overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists.").

In United States v. Williams, 128 S. Ct. 1830 (2008), the Supreme Court implied that it disfavors facial challenges, preferring to review circumstances under which the challenged statute actually infringes protected speech. The Court noted that the overbreadth doctrine tends "to summon forth an endless stream of fanciful hypotheticals" that may potentially implicate the infringement of protected speech. Id. at 1843. The Court further stated that the "'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" Id. at 1844 (quoting Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984)). The Court described hypothetical scenarios discussed at oral argument, and noted that if those situations came to pass, the affected parties could bring an as-applied challenge. Id.; see also Washington State Grange v. Washington State Republican Party, 128 S. Ct. 1184, 1191 ("Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. . . . Facial challenges also run contrary to the fundamental principle of judicial restraint that

7

courts should not . . . formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.").

As previously discussed, the first prong of Section 1140 prohibits the use of words such as "social security" in a manner that the speaker "knows or should know would convey" the false impression of government approval or endorsement. Like other forms of public deception, fraudulent charitable solicitation is unprotected speech. Illinois v. Telemarketing Assocs., Inc., 538 U.S. 600, 611-12 (2003). Therefore, the prong of Section 1140 that contains the "knowing" standard is not unconstitutionally overbroad. Likewise, the First Amendment does not protect a speaker who uses the prohibited language in such a way that he or she "should know" that the message will mislead or deceive the reader.

The second part of Section 1140 requires closer analysis because it does not require that the speaker "know" or "should know" that the language could mislead the reader. Rather, the second prong of the statute prohibits the use of the language in such a way that the reader could reasonably interpret as conveying governmental endorsement. Because this prong does not have a scienter requirement for the speaker, it could possibly reach some protected speech. However, it is wholly unclear that such non-deceptive speech reaches a "substantial" amount of protected speech. NTU has failed to provide any significant examples of protected speech falling under the statute and its counsel essentially disavowed the overbreadth claim at oral argument. Given the lack of

8

evidence of the second prong's "substantial" burden on protected speech, we find that the objective prong of Section 1140 is not overbroad.

We note that the Fourth Circuit has also examined a similar facial challenge to Section 1140 in United Seniors Ass'n, Inc. v. Soc. Sec. Admin., 423 F.3d 397, 406-07 (4th Cir. 2005). As in this case, the Fourth Circuit held that, while the objective prong of Section 1140 could reach some protected speech, any such speech constituted, "at most, a minuscule portion of the speech reached by the statute." Id. at 407.

For these reasons, we reject NTU's facial challenge.

B.    Monetary Fine[5]

NTU next challenges the penalty imposed by the ALJ, arguing that it is criminal in nature and "excessive" in violation of the Eighth Amendment.

In Myrie v. Comm'r, N.J. Dept. of Corr., this Court examined the issue of whether a surcharge at a prison commissary was civil or criminal in nature, and whether the surcharge was excessive. This Court explained that the first step in such an inquiry is to determine whether the legislature, "'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" 267 F.3d 251, 256 (3d Cir. 2001) (quoting Hudson v. United States, 522 U.S. 93, 99 (1997)). This inquiry is clear, because Section 1040 expressly permits a "civil money penalty" for violation of the

_____

[5] An appellate court reviews the question of whether a fine is constitutionally excessive under a de novo standard. United States v. Bajakajian, 524 U.S. 321, 337 n.10 (1998).

statute.  42 U.S.C. § 1320b-10(b) (emphasis added).

Under Myrie, the Court next examines whether the "statutory scheme [i]s so punitive either in purpose or effect . . . as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty.'" Myrie, 267 F.3d at 256 (quoting Hudson, 522 U.S. at 99-100) (internal citations omitted). This inquiry requires the Court to apply the seven criteria identified in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963). These criteria include

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .

Id.

Applying these criteria to NTU's penalty of $.50 per unit that violated Section 1140, we conclude that the criteria do not support NTU's contention that the penalty is criminal in nature.  First, NTU concedes that the penalty does not involve an "affirmative disability or restraint."  (App. Br. at 32.)  Second, the Supreme Court has stated that monetary penalties have not "historically been viewed as punishment."  Hudson, 522 U.S. at 104.  Next, as discussed in Section II.A.2., supra, a violation of Section 1140 does not necessarily require a finding of scienter.  Although Section 1140's monetary penalty likely promotes the traditional ends of punishment, retribution and deterrence, to

10

some degree, that alone is not enough to characterize the penalty as penal in nature, rather than civil. See id. at 105 ("[T]he mere presence of [deterrence] is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals.") (internal citation and quotation marks omitted). In fact, one of the alternative purposes of the sanction is to reimburse the Social Security Trust Fund for the cost of policing deceptive practices. STAFF OF H.R. COMM. ON WAYS AND MEANS, 102D CONG., REPORT ON DECEPTIVE SOLICITATIONS, at 7 (Comm. Print 1992). In addition, Section 1140 is not consistent with criminal behavior, because a civil penalty reaches negligent conduct, whereas actual fraud is required for a crime. With regard to "whether an alternative purpose to which it may rationally be connected is assignable for it," this Court has interpreted this inquiry to ask "whether an asserted 'sanction' may be reasonably regarded as having a purpose other than punishment." Myrie, 267 F.3d at 261. As previously noted, the legislative history demonstrates that aside from punishment, there are the additional goals of deterrence, as well as funding the cost of enforcement of Section 1140. STAFF OF H.R. COMM. ON WAYS AND MEANS, 102D CONG., REPORT ON DECEPTIVE SOLICITATIONS, at 9 (Comm. Print 1992). Finally, the fine at issue is not "excessive in relation to the alternative purpose assigned." When compared to the cost to the government to enforce Section 1140, the $.50 per unit fine is not excessive. Moreover, it is far less than the maximum fine of $5,000 per violation that the statute permits.

Likewise, we find NTU's contention that the fine violates the Excessive Fines Clause of the Eighth Amendment meritless. To violate the Excessive Fines Clause, the fine must be both "excessive" and a "fine." Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 420 (3d Cir. 2000). For the reasons noted above, the penalty at issue is neither "excessive" nor a "fine," which more commonly refers to a penalty for a criminal offense. Id. (citing Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265 (1989)).

C.     Expert Testimony[6]

NTU asks this Court to endorse the application of Daubert to administrative proceedings and to strike the testimony of Professor William Arnold, the expert who testified for the government before the ALJ. Daubert sets forth rules for determining whether expert witnesses who testify in federal trials are reliable and relevant as required by the Federal Rules of Evidence. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Here, NTU argues that Professor Arnold's testimony was "sloppy and unscientific" and should have been excluded from the administrative hearing under Daubert. However, neither the Federal Rules of Evidence nor Daubert apply to administrative hearings. See, e.g., 20 C.F.R. § 498.217(b) ("[T]he ALJ will not be bound by the Federal Rules of Evidence, but may be guided by them in ruling on the

_____

[6]This Court will defer to fact determinations by the agency "if supported by substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a-7a(e) (incorporated by reference in 42 U.S.C. § 1320b-10(c)(1)).

12

admissibility of evidence." (emphasis added)); Bayliss v. Barnhart, 427 F.3d 1211, 1218 n.4 (9th Cir. 2005) (explaining that Daubert does not govern the admissibility of evidence before an ALJ). But see Niam v. Ashcroft, 354 F.3d 652, 660 (7th Cir. 2004) (applying the "spirit of Daubert" to administrative proceedings).

We find NTU's arguments without merit. Not only did the ALJ explain the Professor's extensive credentials in her opinion, but she conceded that she did not rely on his testimony in reaching her decision. Specifically, the ALJ noted that "much of Professor Arnold's testimony simply states the obvious. Interpreting the plain meaning of the language on such blatantly deceptive mailers does not require great expertise." (App. at 17 n.9.) Even without considering the testimony of Professor Arnold, we find that there is substantial evidence in the record to support the ALJ's determination.

For the foregoing reasons, we will deny NTU's petition.