**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 23, 2023

González C.J.
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 23, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 100493-1 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| TVI, INC., d/b/a Value Village, | ) | |
| | ) | Filed: February 23, 2023 |
| Respondent. | ) | |
| | ) | |

YU, J. — The State brought multiple claims alleging that TVI Inc., doing business as Value Village, uses deceptive advertising and marketing in violation of the Consumer Protection Act (CPA), ch. 19.86 RCW. TVI argues that these claims infringe on its First Amendment right to solicit charitable contributions on behalf of nonprofit organizations. U.S. CONST. amend. I. We agree with TVI. Accordingly, we remand to the trial court for dismissal of the State's claims.

*State v. TVI, Inc.*, No. 100493-1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.     Background regarding TVI's business model and relationship to nonprofits

The State's CPA claims are based on TVI's marketing, not its business model. Nevertheless, some background information on TVI's business is necessary to evaluate the issues presented.

TVI has been headquartered in Bellevue, Washington, since the 1970s. At the time of trial, TVI operated about 20 for-profit thrift stores in Washington under the name Value Village. Approximately 93 percent of Value Village's retail inventory consists of used goods donated by the community. To source these community donations, TVI contracts with third-party nonprofit organizations, which TVI calls its "'charity partners.'" Clerk's Papers (CP) at 1165. At the time of trial, TVI had seven charity partners in Washington.

There are two ways in which TVI contracts with its charity partners to obtain donations. First, a charity partner may independently solicit and collect donations from the public and then bring the donated items to Value Village. Second, members of the public may make on-site donations at Value Village's Community Donation Centers, which feature the names and logos of local charity partners. In both methods, TVI pays its charity partners for all donated items on a per-pound or

per-item basis, regardless of whether the items can be sold at retail in Value

Village stores.[1]

By working with charity partners, TVI obtains inventory at a lower price

than it would pay a for-profit supplier. The charity partners, in turn, receive a

predictable source of unrestricted funding, as well as publicity from TVI's

marketing.

B.     TVI's advertising and marketing

The record contains hundreds of examples of TVI's marketing. To briefly

summarize, TVI markets itself online and through in-store signs, brochures, and

flyers. TVI's in-store marketing is generally similar across locations, but there is

some variation due to different store layouts and local regulations.

Much of TVI's marketing explicitly solicits on-site donations. *E.g.*, Exs.

2048 ("Donate here" because "Value Village pays local nonprofits every time you

donate"), 2056, at 1 ("Do good in your neighborhood" by donating); *cf.* Exs. 2033,

2037, 2051. TVI also incentivizes donations by giving "Hero Cards" to people

who donate, which can be redeemed for discounts on items purchased at Value

Village. Ex. 643, at 4.

---

[1] About 75 percent of donated items cannot be sold in retail stores. These items are sold to "second-hand markets, downcycling markets, and recycling markets" overseas. CP at 1167. Only about 5 percent of TVI's revenue comes from "the recycling [and] reuse part of the business." Verbatim Tr. of Proc. (Oct. 3, 2019) at 893-94.

*State v. TVI, Inc.*, No. 100493-1

However, "[n]inety percent of TVI's advertising and marketing budget promotes shopping and retail sales (as opposed to donating)." CP at 1182. This sales-oriented marketing includes a variety of messages about the benefits of thrift shopping, such as saving money ("Enjoy A+ deals on back to school" or "Complete outfits under $20"), protecting the environment ("Your purchase is helping to save over 700 million pounds from landfills annually"), and choosing from a wide variety of rotating merchandise ("Over 5,000 items arrive daily"). Exs. 2663, 2748, 2766.

In addition, TVI's marketing has always featured its unique business model. The Value Village website includes visual depictions of the "Value Village Cycle" to explain how it obtains, pays for, and sells or recycles donated items. Ex. 895, at 1. In-store signs state, "Our charity partners sell us goods they collect for reliable revenue that helps fund their missions," and they encourage customers to "Help Your Neighbors. Help the World. Shop and Donate." Exs. 2730, 645, at 12. Signs and brochures at Value Village stores provide additional explanations of TVI's business model, sometimes describing it as "The Savers Cycle." Ex. 726, at 15; *cf.* Exs. 2051, 2830. TVI's marketing does not claim that it is a nonprofit organization or that TVI donates a portion of its sales revenue to charity. To the contrary, where TVI's marketing identifies its corporate structure, it explicitly states that it is a "for-profit thrift store chain." Ex. 853.

4

*State v. TVI, Inc.*, No. 100493-1

C.    TVI's communications with state agencies

The secretary of state contacted TVI three times between 2002 and 2013 to determine if TVI must register as a commercial fundraiser pursuant to the charitable solicitations act (CSA), ch. 19.09 RCW.[2]  Each time, TVI provided the requested information and, each time, the secretary of state determined that TVI did not need to register.

In 2013, the Consumer Protection Division of the Attorney General's (AG's) Office received a complaint from a Washington resident that TVI's marketing gives the false impression that Value Village is a nonprofit.  The complaint was forwarded to TVI for response and was ultimately closed without further action by the AG.  In 2014, a media inquiry again brought TVI to the attention of the AG's Consumer Protection Division.

The AG wrote to TVI in November 2014, instructing it to register as a commercial fundraiser pursuant to the CSA.  TVI promptly registered as a commercial fundraiser and renewed its registration every year.  By the summer of 2015, TVI had posted signs in its stores disclosing its status as a for-profit commercial fundraiser in its stores.  Value Village employees also make regular

---

[2] A "commercial fundraiser" is "any entity that for compensation or other consideration directly or indirectly solicits or receives contributions within this state for or on behalf of any charitable organization or charitable purpose."  RCW 19.09.020(5).  Commercial fundraisers must register with the secretary of state, file "solicitation report[s]" about their fundraising efforts, and make "clear and conspicuous disclosures at the point of solicitation."  RCW 19.09.079(6), .100(1).

announcements through the stores' public address systems that Value Village is a

for-profit commercial fundraiser.

The AG's November 2014 letter raised additional concerns that TVI's

"solicitations for charitable contributions and advertisements for its retail stores"

were "misleading or deceptive" in violation of the CPA. Ex. 2627, at 2. Following

three years of investigation, the State filed this lawsuit.

D.     Penalty phase trial and interlocutory appeal

On December 20, 2017, the State filed a complaint against TVI in King

County Superior Court, raising one CSA claim and six CPA claims.[3] In its CPA

claims, the State alleged that TVI's marketing created six distinct deceptive net

impressions. Only three are presented on review: (1) "that [TVI] is itself a

nonprofit or charitable organization," (2) "that in-store purchases . . . provide a

financial benefit to [TVI's] charity partners," and (3) "that donations accepted at

[TVI's] retail stores in the Spokane, Washington, market benefitted The Rypien

Foundation" from January 2014 to February 2015.[4] CP at 34.

---

[3] The State's CSA claim alleged that "[b]etween January 3, 2015, and October 2015, [TVI] operated as a commercial fundraiser and solicited for donations on behalf of its charity partners without including the disclaimers required by RCW 19.09.100 at the point of solicitation." CP at 36. This claim was based on the State's view "that, in their estimation, TVI took too long" to post CSA disclosures. *Id.* at 1243. Following a bench trial, the trial court rejected this claim as "completely unreasonable." *Id.*

[4] The other alleged deceptive net impressions were that TVI "paid its charity partners for all donations . . . when in fact, [TVI] did not pay its charity partners for donations of housewares, furniture, and other miscellaneous items," "that donations accepted at its retail stores and other locations benefitted a single charity partner, when in fact, [TVI] split payments for donations

*State v. TVI, Inc.*, No. 100493-1

TVI denied that its marketing is deceptive and further argued that the State's

CPA claims violate the First Amendment. The trial court determined that all of

TVI's speech should be treated as fully protected charitable solicitations, but it

rejected TVI's argument that the First Amendment requires the State to prove

"intentionally fraudulent behavior." *Id.* at 1011. Instead, the trial court adopted

the State's proposed standard, which required the State to prove only that TVI

"knew or should have known" its marketing "would be deceptive or misleading, or

at least leave a deceptive net impression." *Id.* at 1014.

The case was tried to the bench. The trial court made extensive findings and

conclusions, and ruled for the State on the three CPA claims now before us. The

State's other CPA and CSA claims were rejected on the merits. The trial court

reserved ruling on attorney fees and costs until the penalty phase, which has not yet

occurred.[5]

TVI sought interlocutory review of the three CPA claims on which the State

prevailed. The State did not seek cross review of its unsuccessful claims. The

---

among multiple charity partners," and "that donations made at its Edmonds, Everett, and Marysville, Washington, stores benefitted The Moyer Foundation." CP at 34-35. Each of these claims was rejected on the merits after a bench trial. *Id.* at 1237-41.

[5] Both parties requested attorney fees and costs at trial pursuant to RCW 19.86.080(1). The State also requested appellate attorney fees at the Court of Appeals. Br. of Resp't State of Wash. at 46 (Wash. Ct. App. No. 80915-6-I (2020)). However, TVI argued that the appellate courts "should leave any fee award (to either party) to the superior court in the first instance." Reply Br. of Pet'r TVI Inc. at 25 n.9 (citing RAP 18.1(i)) (Wash. Ct. App. No. 80915-6-I (2021)). We agree with TVI and remand the question of attorney fees and costs to the trial court.

*State v. TVI, Inc.*, No. 100493-1

Court of Appeals granted review and reversed in a published opinion. *State v. TVI, Inc.*, 18 Wn. App. 2d 805, 493 P.3d 763 (2021). The Court of Appeals affirmed that TVI's marketing must be treated as charitable solicitations but held that adding a mens rea element to the CPA would alter the statute in violation of the separation of powers. *Id.* at 819, 824. Therefore, the Court of Appeals remanded for dismissal of the State's CPA claims.

We granted the State's petition for review. A joint amici brief supporting TVI was filed by two of its charity partners, Northwest Center and Big Brothers Big Sisters of Puget Sound. Amici briefs supporting the State were filed by Truth in Advertising Inc., the University of California Berkeley Center for Consumer Law and Economic Justice, and Professor Rebecca Tushnet; the Washington State Association for Justice Foundation; and 14 states and the District of Columbia.[6] We now affirm the Court of Appeals in result.

ISSUES

A.    Should the marketing at issue in this case be treated as charitable solicitations or commercial speech?

B.    Can the State's CPA claims survive the applicable level of First Amendment scrutiny?

_____

[6] The 14 states are Minnesota, Oregon, California, Colorado, Connecticut, Delaware, Idaho, Illinois, Maine, Maryland, Nevada, New Mexico, Pennsylvania, and Rhode Island.

*State v. TVI, Inc.*, No. 100493-1

## STANDARDS OF REVIEW

This case presents questions of "constitutional law," which are "reviewed de novo." *State v. Grocery Mfrs. Ass'n*, 195 Wn.2d 442, 456, 461 P.3d 334 (2020). There are also specific standards that apply because this is a First Amendment case in which the State seeks to restrict TVI's speech based on its allegedly deceptive content. In this context, TVI does *not* have the burden to prove a constitutional violation. Instead, the "government bears the burden of justifying its restrictions on speech." *City of Lakewood v. Willis*, 186 Wn.2d 210, 217, 375 P.3d 1056 (2016) (plurality opinion).

The State's burden depends on the type of speech being restricted. Charitable solicitations are fully protected by the First Amendment, so the State must satisfy "exacting" or "strict" scrutiny to justify content-based restrictions.[7] *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 798, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988) (*Riley*); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. ___, 138 S. Ct. 2361, 2374, 201 L. Ed. 2d 835 (2018). By contrast, "the Constitution accords less protection to commercial speech," and the State "may ban forms of communication more likely to deceive the public than to inform it." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64, 103 S. Ct. 2875, 77

---

[7] There is some dispute in the briefing as to whether exacting scrutiny is the same as, or less demanding than, strict scrutiny. We decline to decide that question because it is unnecessary to our resolution of this case.

*State v. TVI, Inc.*, No. 100493-1

L. Ed. 2d 469 (1983); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980).

The parties dispute the type of speech that is at issue in this case. The State argues that its CPA claims target only deceptive, unprotected commercial speech. TVI argues that the State's claims target fully protected charitable solicitation. In resolving this dispute, we "must be exceedingly cautious." *State v. Kilburn*, 151 Wn.2d 36, 49, 84 P.3d 1215 (2004).

"[T]o avoid chilling protected speech, the government must bear the burden of proving that the speech it seeks to prohibit is unprotected." *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 620 n.9, 123 S. Ct. 1829, 155 L. Ed. 2d 793 (2003) (*Madigan*). Moreover, "[i]t is not enough to engage in the usual process of assessing whether there is sufficient evidence in the record to support the trial court's findings." *Kilburn*, 151 Wn.2d at 49. Instead, we must "'conduct[ ] an independent review of the record'" to ensure that the correct First Amendment standards are applied "'and to confine the perimeters of any unprotected category within acceptably narrow limits.'" *Id.* at 50 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)). Therefore, as a matter of "'federal constitutional law,'" we do *not* defer to the trial court's findings on "'crucial' facts that necessarily involve

10

*State v. TVI, Inc.*, No. 100493-1

the legal determination whether the speech is unprotected." *Id.* at 50 (quoting

*Bose*, 466 U.S. at 510), 52.

## ANALYSIS

The State does not claim that TVI's business model or practices violate the

CPA. Instead, the State's claims are based on TVI's marketing. According to the

State, TVI's marketing falsely implies (but does not explicitly state) that TVI is a

nonprofit organization that donates a portion of its sales revenue to charity. To

decide whether the State's claims violate the First Amendment, we must first

determine, and then apply, the appropriate level of First Amendment scrutiny.

The applicable level of scrutiny depends on the nature of the speech at issue.

If the State's claims target only ordinary commercial speech, then intermediate

scrutiny applies. However, if the State's claims target charitable solicitations, then

we must apply "exacting First Amendment scrutiny." *Riley*, 487 U.S. at 789.

Classifying the targeted speech requires a fact-specific inquiry, which must be

informed by TVI's unique business model.

TVI must solicit charitable donations on behalf of nonprofits to maintain its

retail inventory. At the same time, these charitable solicitations necessarily

advance TVI's own commercial interests. Under this arrangement, it is impossible

for TVI to separate the commercial and charitable elements of its marketing.

Because we cannot apply different levels of scrutiny to different parts of the same

11

*State v. TVI, Inc.*, No. 100493-1

speech, we must treat all of the marketing in this case as charitable solicitations.

*Id.* at 796.  Thus, each of the State's CPA claims must survive exacting scrutiny.

Exacting scrutiny requires the State to make "properly tailored" allegations

and satisfy "[e]xacting proof requirements."  *Madigan*, 538 U.S. at 619-20.  The

CPA ordinarily imposes strict liability, which the parties agree cannot satisfy

exacting proof requirements.  To address this concern, the trial court added a

"knew or should have known" mens rea element to the State's claims in this case.

However, even with this additional element, the State's CPA claims cannot survive

exacting First Amendment scrutiny because they are not supported by properly

tailored allegations and exacting proof.

A.     The State's CPA claims target inextricably intertwined charitable
       solicitations and commercial speech

The State has not met its burden of proving that its CPA claims target only

unprotected, deceptive commercial speech.  To the contrary, the State relied on

TVI's charitable solicitations to prove each of its claims at the trial court.  The

record shows that it would have been "impossible" for TVI to separate these

charitable solicitations from its commercial speech.  *Bd. of Trs. of State Univ. of*

*N.Y. v. Fox*, 492 U.S. 469, 474, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) (*Fox*).

Thus, in the context of the claims presented here, TVI's commercial speech and

charitable solicitations are "inextricably intertwined," and we must treat all of the

speech in this case as "fully protected expression."  *Riley*, 487 U.S. at 796.

12

*State v. TVI, Inc.*, No. 100493-1

      1.      Background on commercial speech, charitable solicitations, and inextricably intertwined speech

At one time, the United States Supreme Court held that the First Amendment does not protect "purely commercial advertising." *Valentine v. Chrestensen*, 316 U.S. 52, 54, 62 S. Ct. 920, 86 L. Ed. 1262 (1942), *overruled by Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976). However, the Court has since recognized the public's "strong interest in the free flow of commercial information." *Va. State Bd. of Pharmacy*, 425 U.S. at 764. Therefore, "[t]he First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Cent. Hudson*, 447 U.S. at 561.

Nevertheless, commercial speech is entitled to "lesser protection" because there is a "'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Id.* at 563; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978) (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 771 n.24). Therefore, content-based restrictions on commercial speech are subject to "an intermediate level of scrutiny." *Cent. Hudson*, 447 U.S. at 573 (Blackmun, J., concurring); *see also id.* at 563-66 (majority opinion).

13

*State v. TVI, Inc.*, No. 100493-1

Following its adoption of limited protections for commercial speech, the

Supreme Court was asked whether "canvassing and soliciting by religious and

charitable organizations" also deserve only limited First Amendment protections.

*Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628, 100 S. Ct.

826, 63 L. Ed. 2d 73 (1980).  The answer is no.  In contrast to ordinary commercial

speech, "charitable appeals for funds . . . involve a variety of speech interests—

communication of information, the dissemination and propagation of views and

ideas, and the advocacy of causes—that are within the protection of the First

Amendment."  *Id.* at 632.  As a result, "the solicitation of charitable contributions

is protected speech," and content-based restrictions on charitable solicitation are

subject to "exacting First Amendment scrutiny."  *Riley*, 487 U.S. at 789.

In some cases, the speech at issue clearly "fall[s] within the core notion of

commercial speech—'speech which does no more than propose a commercial

transaction.'"  *Bolger*, 463 U.S. at 66 (internal quotation marks omitted) (quoting

*Va. State Bd. of Pharmacy*, 425 U.S. at 762).  However, in many cases, courts must

confront "the difficulty of drawing bright lines that will clearly cabin commercial

speech in a distinct category."  *City of Cincinnati v. Discovery Network, Inc.*, 507

U.S. 410, 419, 113 S. Ct. 1505, 123 L. Ed. 2d 99 (1993).

Some speech may be classified as commercial, even if it "cannot be

characterized merely as proposals to engage in commercial transactions."  *Bolger*,

14

*State v. TVI, Inc.*, No. 100493-1

463 U.S. at 66. Conversely (and of particular importance in this case), commercial speech does not "retain[ ] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley*, 487 U.S. at 796. Therefore, in cases of inextricably intertwined speech, courts must "apply [the] test for fully protected expression." *Id.*

To properly classify TVI's marketing, we conduct "a two-step analysis." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012). First, we "must determine as a threshold matter if [the marketing] as a whole constitutes commercial speech." *Id.* If not, then we apply the First Amendment's protections for fully protected charitable solicitations. However, if the State's claims target commercial speech, then we "must determine whether the speech still receives full First Amendment protection, because the commercial aspects of the speech are 'inextricably intertwined' with otherwise fully protected speech." *Id.* at 958.

We must be cautious in our determination because "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger*, 463 U.S. at 68 (quoting *Cent. Hudson*, 447 U.S. at 563 n.5). As a result, the "inextricably intertwined" analysis does not ask "whether the speech in question combines commercial and noncommercial elements, but whether it was *legally or practically impossible* for

15

*State v. TVI, Inc.*, No. 100493-1

the speaker to separate them." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 521 (7th Cir. 2014) (emphasis added); *see also Fox*, 492 U.S. at 474.

Because there are no bright-line rules defining commercial speech, our analysis must be "'fact-driven.'" *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council*, 721 F.3d 264, 284 (4th Cir. 2013)). We must also be mindful of "critical" differences "between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations." *Madigan*, 538 U.S. at 617. This is an individual case that purports to "target[ ] fraudulent representations." *Id.* at 619. Therefore, we must consider the speech that is "targeted" by each of the State's CPA claims.

> 2. Each of the State's CPA claims targets inextricably intertwined charitable solicitations and commercial speech

Both the trial court and the Court of Appeals treated TVI's speech as inextricably intertwined. The State now contends "that much, if not the vast majority of TVI's advertising and other commercial speech is standalone and thus, not inextricably intertwined." Pet. for Rev. at 22. However, the record shows that *none* of the State's CPA claims target "standalone" commercial speech. Instead, each claim is based on charitable solicitations that cannot be separated from TVI's commercial speech. Therefore, the speech at issue in this case is inextricably intertwined, and we must apply full First Amendment protections.

16

*State v. TVI, Inc.*, No. 100493-1

> a.  The State's first claim targets inextricably intertwined speech in TVI's solicitations for on-site donations

The first claim presented on review alleges that TVI "creat[es] the deceptive net impression that it is itself a nonprofit or charitable organization."  CP at 34.  Although this claim ostensibly targets TVI's marketing as a whole, the record shows that this claim relies on marketing that explicitly solicits donations.

Every example of marketing that the State highlighted in its trial brief to support this claim is a solicitation for donations.  *Id.* at 721-22 (citing Exs. 453, 455, 456, 461, 481).  Likewise, in its closing argument on this claim, the State pointed to the "onslaught of signage" encouraging donations at Value Village.  Verbatim Tr. of Proc. (VTP) (Oct. 21, 2019) at 1835.  The trial court's ruling on this claim reflects the same focus, concluding that TVI's deceptive "acts or practices" consisted of marketing materials "promoting [TVI's] relationship with charities and encouraging donations of used goods at its stores."  CP at 1233.

TVI contends that this claim targets *only* charitable solicitations, not commercial speech, so we need not engage in an "inextricably intertwined" analysis at all.  However, when TVI solicits for donations, it frequently includes the Value Village logo and corporate slogan, in addition to the logos of its charity partners.  *See* Exs. 453, 455, 468, 481, 897, at 1, 2033, 2037, 2051, 2056.  Moreover, TVI will attempt to sell any donations it obtains for a profit.  Therefore,

17

*State v. TVI, Inc.*, No. 100493-1

TVI's solicitations for donations clearly advance its own commercial interests and are, at least in part, commercial speech.

Nevertheless, it is clear that TVI's solicitations for donations are not *solely* commercial speech. TVI pays its charity partners for all donations, regardless of whether the donated items can be sold in stores. In this way, TVI's relationship to its charity partners is similar to that of any professional fundraiser—that is why TVI must register pursuant to the CSA. Commercial fundraisers are vital to "certain charities (primarily small or unpopular ones)," and their charitable solicitations are fully protected speech. *Riley*, 487 U.S. at 794.

In addition, TVI's solicitations often features the names and logos of its charity partners. *See* Exs. 2033, 2037, 2048, 2051, 2056. This provides the charity partners with "greater community recognition." CP at 177. "The mere inclusion of the name of a charity on a donation box communicates information about the beneficiary of the benevolence and explicitly advocates for the donation of clothing and household goods to that particular charity." *Nat'l Fed'n of Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 213 (5th Cir. 2011). TVI's solicitations for donations on behalf of its charity partners are no different.

Thus, the marketing targeted by the State's first claim includes both commercial speech and charitable solicitations. The question is whether the commercial and charitable elements are inextricably intertwined. We hold that

18

*State v. TVI, Inc.*, No. 100493-1

they are. Due to TVI's unique business model, donations are just as vital to TVI's business as retail purchases. Indeed, without donations, there could be no retail purchases because over 90 percent of TVI's retail inventory is donated.

Therefore, in contrast to the cases cited by the State and allied amici, TVI's charitable solicitations in this case cannot be characterized as a mere "secondary purpose" in "[a]n advertisement primarily intended to reach consumers and to influence them to buy the speaker's products." *Contra Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 968, 45 P.3d 243, 119 Cal. Rptr. 2d 296 (2002). TVI could not "easily sell their wares without reference to" charitable donations because without donations, TVI would have almost no wares to sell. *Contra Hunt v. City of Los Angeles*, 638 F.3d 703, 716 (9th Cir. 2011).

It would be "practically impossible" for TVI to separate its charitable solicitations from its commercial marketing. *Jordan*, 743 F.3d at 521. Therefore, the State's first claim targets inextricably intertwined speech.

> b.   The State's second claim targets inextricably intertwined speech in TVI's marketing of its business model

The second claim before us alleges that TVI "creat[es] the deceptive net impression that in-store purchases made at its stores . . . provide a financial benefit to its charity partners." CP at 34. This claim also ostensibly targets all of TVI's advertising and marketing. However, the record shows that this claim specifically relies on TVI's marketing of its business model.

19

To support this claim, the State's trial brief pointed to signs thanking the public for "shopping and donating" to "help[ ] benefit" local charity partners. *Id.* at 724 (citing Exs. 575, 645). The State emphasized similar signs in its closing argument. *See* VTP (Oct. 21, 2019) at 1842-44. Likewise, the trial court's ruling relied on "TVI's descriptions of its business model," its "official corporate slogan," "intercom messages [that] discussed doing good by donating and purchasing," and "stamp cards that rewarded donations with discounts for in-store purchases." CP at 1236-37 (boldface omitted).

Similar to the State's first claim, TVI contends that this claim targets *only* charitable solicitations, making an "inextricably intertwined" analysis unnecessary. However, when TVI advertises its business model, it encourages customers to shop as well as donate, thereby advancing TVI's own commercial interests. *See* Exs. 575, 645, at 12, 726, at 15, 895, at 1, 2051, 2830. The marketing targeted by this claim is, in large part, commercial speech. The question is whether this commercial speech is inextricably intertwined with charitable solicitations.

According to the State, "[i]t was entirely possible for TVI to promote itself and to solicit donations for nonprofits without blurring the two together." State of Wash.'s Suppl. Br. at 21. It would certainly be possible for TVI to market its products (used clothing, furniture, and housewares) without making charitable solicitations, and it frequently does so. *E.g.*, Exs. 2663, 2748, 2766. However, the

20

*State v. TVI, Inc.*, No. 100493-1

State's second claim is not based on TVI's marketing of its *products*. Instead, as described above, this claim targets TVI's marketing of its *business model*.

TVI's business model relies on donations for nearly all of its retail inventory. Therefore, when TVI markets its business model, it *must* reference (and at least implicitly encourage) donations on behalf of its charity partners. *E.g.*, Exs. 645, at 12, 726, at 15, 895, at 1, 2051, 2830. These charitable solicitations are not a mere "veneer," as the State contends, nor are they an attempt "to immunize false or misleading product information from government regulation simply by including references to public issues." Pet. for Rev. at 23-24; *Bolger*, 463 U.S. at 68. Instead, they are an integral part of TVI's business.

The trial court suggested that "[n]obody required TVI to focus on its business model as part of its marketing" because TVI could instead "focus[ ] on thrift benefits such as price and the possibility of finding a great bargain." CP at 1235. The State similarly argues that TVI's marketing prior to 2010 is evidence that TVI could advertise its business differently, without emphasizing its business model or relationship to charity partners. Wash. Sup. Ct. oral argument, *State v. TVI, Inc.*, No. 100493-1 (Oct. 25, 2022), at 4 min., 35 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2022101193/?eventID=2022101193.

21

*State v. TVI, Inc.*, No. 100493-1

TVI disputes that its marketing changed in any relevant way in 2010. *Id.* at 20 min., 4 sec. Regardless of the factual accuracy of the State's assertions, we reject the State's analysis as a matter of law because "the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners." *Riley*, 487 U.S. at 791. Neither the AG nor the trial court may substitute its judgment for TVI's in deciding how best to advertise TVI's business.

Companies have a First Amendment right to advertise their "lawful activity." *Cent. Hudson*, 447 U.S. at 563. The State has never claimed that TVI's business model is unlawful, and the trial court specifically found that TVI's business model *is* lawful. Like any other company, TVI has the right to advertise its lawful business model. However, unlike most other for-profit companies, it is impossible for TVI to advertise its business model without engaging in charitable solicitation.

We will not force TVI to choose between the First Amendment's protections for charitable solicitations and the First Amendment right to advertise a lawful business. We therefore hold that the State's second claim targets inextricably intertwined charitable and commercial speech.

22

*State v. TVI, Inc.*, No. 100493-1

        c.       The State's third claim targets inextricably intertwined speech that solicits donations on behalf of the Rypien Foundation

The third and final claim before us concerns alleged deceptive net impressions about TVI's contractual relationship with the Rypien Foundation. As in the State's first claim, discussed above, this third claim targets marketing that solicits on-site donations and features the logo of a charity partner (specifically, the Rypien Foundation). *See* CP at 1222 (citing Exs. 468, 528, 573, 574, 692, 897). Therefore, like the State's first claim, this third claim targets inextricably intertwined speech.

In sum, each of the CPA claims now before us targets charitable solicitation that is inextricably intertwined with commercial speech. "[W]e cannot parcel out the speech, applying one test to one phrase and another test to another phrase." *Riley*, 487 U.S. at 796. Therefore, all of the speech targeted by each of the State's claims must be treated as "fully protected expression." *Id.* When the State seeks to impose content-based restrictions on fully protected expression, it must satisfy "exacting" scrutiny. *Id.* at 798.

B.     Even with an added "knew or should have known" mens rea element, the State's CPA claims cannot satisfy exacting First Amendment scrutiny

The application of the CPA to charitable solicitations appears to be an issue of first impression in our court. However, as applied to commercial speech, the CPA's requirements are well established. When the State brings a CPA claim, it

23

*State v. TVI, Inc.*, No. 100493-1

must prove "(1) an unfair or deceptive act or practice (2) occurring in trade or commerce, and (3) public interest impact." *State v. Kaiser*, 161 Wn. App. 705, 719, 254 P.3d 850 (2011). Ordinarily, the CPA does not require proof that "the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47, 204 P.3d 885 (2009). Moreover, unlike a private plaintiff, the State is not required to prove that the alleged unfair or deceptive act or practice caused "injury to a person's business or property." *Id.* at 37.

We must decide whether the three CPA claims presented, with an added "knew or should have known" mens rea element, satisfy exacting scrutiny. The answer is no. Exacting scrutiny requires the State to make properly tailored allegations and to satisfy exacting proof requirements. Two of the State's claims are not based on properly tailored allegations, and the third is not supported by exacting proof.

1.      Exacting scrutiny requirements for individual lawsuits

The only United States Supreme Court case applying exacting scrutiny to claims targeting allegedly deceptive charitable solicitations is *Madigan*. 538 U.S. 600. There is some tension among federal courts as to what, precisely, is needed to comply with *Madigan*. Nevertheless, the case law is sufficient to guide our decision.

24

*State v. TVI, Inc.*, No. 100493-1

Content-based restrictions on charitable solicitations are "subject to exacting First Amendment scrutiny." *Riley*, 487 U.S. at 798. This affects both generally applicable statutes and individual lawsuits. In the context of a statute, exacting scrutiny requires the government to show that the law is "narrowly tailored" to serve "a sufficiently substantial interest." *Id.* at 792. Disclosure requirements, such as those found in the CSA, satisfy exacting scrutiny. *Id.* at 799 & n.11. However, "prophylactic statutes designed to combat fraud by imposing prior restraints on solicitation" generally do not satisfy exacting scrutiny.[8] *Madigan*, 538 U.S. at 612.

*Madigan* addresses an individual fraud action, rather than a prophylactic statute. In *Madigan*, two "for-profit fundraising corporations" were hired by "a charitable nonprofit corporation, to solicit donations to aid Vietnam veterans." *Id.* at 606-07. Their contracts provided that the fundraisers "would retain 85 percent of the gross receipts from donors within Illinois." *Id.* at 607. However, the fundraisers allegedly told prospective donors that "their contributions would be

---

[8] *See Schaumburg*, 444 U.S. at 624 (striking down local regulation requiring charitable solicitors to prove "'that at least seventy-five per cent of the proceeds of such solicitations will be used directly for the charitable purpose'" (quoting regulation)); *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 950, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984) (striking down statute prohibiting charitable organizations from "agreeing to pay as expenses more than 25% of the amount raised" in "any fundraising activity"); *Riley*, 487 U.S. at 784 (striking down statute that "prohibits professional fundraisers from retaining an 'unreasonable' or 'excessive' fee").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

used for specifically identified charitable endeavors" and that "'90% or more goes to the vets.'" *Id.* at 608 (quoting record).

The Illinois AG filed suit, "assert[ing] common-law and statutory claims for fraud and breach of fiduciary duty" pursuant to Illinois law. *Id.* at 607. The trial court dismissed the complaint based on the First Amendment's protections for charitable solicitations, and the Illinois appellate courts affirmed. *Id.* at 609. The United States Supreme Court reversed.

The Court held that "[l]ike other forms of public deception, fraudulent charitable solicitation is unprotected speech." *Id.* at 612. However, a state "cannot gain case-by-case ground" that is "off limits to legislators." *Id.* at 617. Therefore, "[s]imply labeling an action one for 'fraud,' of course, will not carry the day." *Id.* Instead, to decide whether the Illinois AG's claims could proceed, the *Madigan* Court considered two issues: (1) whether the allegations were "properly tailored" to "target[ ] fraudulent representations" so as not to "impermissibly chill protected speech" and (2) whether applicable Illinois law included "[e]xacting proof requirements" that would "provide sufficient breathing room for protected speech." *Id.* at 619-20.

The Court held that the allegations in *Madigan* were sufficiently tailored because the Illinois AG's claims "target[ed] misleading affirmative representations about how donations [would] be used." *Id.* at 619. In addition, the Illinois AG

26

specifically alleged that these affirmative misrepresentations "intentionally [misled] donors regarding the use of their contributions." *Id.* at 620.

The Court also held that Illinois law included sufficient exacting proof requirements. The Illinois AG would "bear[ ]the full burden of proof" at trial by "clear and convincing evidence," and "an appellate court could independently review the trial court's findings." *Id.* at 620-21. In addition, a "[f]alse statement alone [would] not subject a fundraiser to fraud liability." *Id.* at 620. Instead, the Illinois AG would be required to "show that the defendant made a false representation of a material fact knowing that the representation was false," and "that the defendant made the representation with the intent to mislead the listener, and succeeded in doing so." *Id.*

Thus, to satisfy exacting scrutiny, *Madigan* holds that a lawsuit targeting allegedly deceptive charitable solicitations must be based on properly tailored allegations and subject to exacting proof requirements. As the trial court and Court of Appeals in this case correctly recognized, strict CPA liability would violate *Madigan* because it would allow for liability based on a "[f]alse statement alone." *Id*. That much is undisputed by the parties.

The trial court attempted to remedy this problem by adding a "knew or should have known" mens rea element to the State's claims. The Court of Appeals held sua sponte that adding a mens rea to the CPA as applied violated "the

27

separation of powers" by altering the statute. *TVI*, 18 Wn. App. 2d at 824 (citing *Willis*, 186 Wn.2d at 219). In addition, TVI argues that the addition of a "knew or should have known" mens rea is not sufficient to satisfy *Madigan*.

While we affirm the Court of Appeals in result, it is not necessary to decide whether a narrowing construction could be properly applied to the CPA in an as-applied First Amendment challenge. *See, e.g.*, *Grocery Mfrs. Ass'n*, 195 Wn.2d at 455 (narrowing construction of the Fair Campaign Practices Act, ch. 42.17 RCW). The State's claims in this case do not satisfy exacting First Amendment scrutiny, even with the narrowing construction applied by the trial court.

2. The State's CPA claims do not satisfy exacting scrutiny

The parties take strongly opposed positions as to what, precisely, exacting scrutiny requires. TVI argues that the State must prove all of the elements identified in *Madigan*: that TVI made "(1) knowingly false representations, (2) with intent to mislead donors, and (3) succeeding in doing so and causing donors harm." Suppl. Br. of Resp't TVI Inc. at 10. To support its position, TVI points to opinions by federal courts indicating that "materiality, intent to defraud, and injury" are all "critical" elements in a claim targeting allegedly deceptive, fully protected speech. *United States v. Alvarez*, 617 F.3d 1198, 1212 (9th Cir. 2010), *aff'd*, 567 U.S. 709 (2012) (plurality opinion); *see also Urzua v. Nat'l Veterans Servs. Fund, Inc.*, 2014 WL 12160751, at *3 (S.D. Cal. 2014).

*State v. TVI, Inc.*, No. 100493-1

The State, however, argues that adding a "knew or should have known" mens rea to the CPA is sufficient because the "'First Amendment does not protect a speaker who . . . "should know" that the message will mislead or deceive the reader.'" State of Wash.'s Suppl. Br. at 28 (quoting *Nat'l Taxpayers Union v. Soc. Sec. Admin.*, 302 F. App'x 115, 119 (3d Cir. 2008), *cert. denied*, 558 U.S. 816 (2009)).[9] Like TVI, the State points to opinions by federal courts to support its position, but the opinions highlighted by the State specifically reject the view "that the government can only regulate charitable solicitation to prevent actual fraud." *United Seniors Ass'n v. Soc. Sec. Admin.*, 423 F.3d 397, 407 (4th Cir. 2005), *cert. denied*, 547 U.S. 1162 (2006); *see also Nat'l Taxpayers Union*, 302 F. App'x at 118; *United States v. Corps. for Character, LC*, 116 F. Supp. 3d 1258, 1267 (D. Utah 2015).

Thus, the parties dispute whether the elements specified in *Madigan* are necessary (as TVI argues) or merely sufficient (as the State argues). We decline to resolve this dispute because the State's claims cannot survive exacting scrutiny, even by its own proposed standard.

---

[9] Unpublished federal opinions issued on or after January 1, 2007, may be cited pursuant to GR 14.1(b) and FED. R. APP. P. 32.1(a).

29

*State v. TVI, Inc.*, No. 100493-1

        a.      The State's first and second claims are not based on properly tailored allegations

As discussed above, *Madigan* requires the State to make "properly tailored" allegations in claims targeting allegedly deceptive charitable solicitations. 538 U.S. at 619. The State's first two claims fail at this step.

The first claim is that TVI's marketing "creat[es] the deceptive net impression that it is itself a nonprofit or charitable organization." CP at 34. The second claim is that TVI's marketing "creat[es] the deceptive net impression that in-store purchases made at its stores . . . provide a financial benefit to its charity partners." *Id.* Thus, both of these claims are based on alleged deceptive net impressions, rather than specific false statements.

As applied to ordinary commercial speech, the CPA allows for deceptive net impression claims because "a communication may be deceptive by virtue of the 'net impression' it conveys, even though it contains truthful information." *Panag*, 166 Wn.2d at 50 (quoting *Fed. Trade Comm'n v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)). However, we must be cautious in assessing deceptive net impression claims as applied to charitable solicitations to ensure that they do not impermissibly chill protected speech.

The State argues that deceptive net impression claims are entirely appropriate in this context based on a federal statute, 42 U.S.C. § 1320b-10. In relevant part, this statute prohibits the use of specified words and symbols in a way

30

that the speaker "knows or should know would convey . . . the false impression" that their message "is approved, endorsed, or authorized by the Social Security Administration." 42 U.S.C. § 1320b-10(a)(1). Thus, like a deceptive net impression CPA claim, this statute prohibits speech that is not technically false but is nevertheless misleading. Moreover, consistent with the State's position here, the statute requires only a "knew or should have known" mens rea.

The Third and Fourth Circuits of the Courts of Appeals have upheld 42 U.S.C. § 1320b-10 on its face and as applied to fully protected, noncommercial speech, and the United States Supreme Court denied certiorari in both cases. *United Seniors Ass'n*, 423 F.3d at 406-08 (facial overbreadth and vagueness); *Nat'l Taxpayers Union*, 302 F. App'x at 118 (as-applied), 118-20 (facial overbreadth). The State therefore argues by analogy that its claims in this case satisfy First Amendment scrutiny.

However, the State's claims in this case are *not* analogous to 42 U.S.C. § 1320b-10 claims. That statute prohibits the misleading use of specific words (such as "'Social Security'" and "'Social Security Account'") and specific symbols (such as the "emblem of the Social Security Administration"). 42 U.S.C. § 1320b-10(a)(1)(A)-(B). Thus, if the government wishes to pursue a claim pursuant to 42 U.S.C. § 1320b-10, it must allege that the speaker used those specific words or symbols in a misleading way. Such tailored allegations are fully consistent with

31

*Madigan*, and were, in fact, made in both of the cases the State relies on. *See United Seniors Ass'n*, 423 F.3d at 400; *Nat'l Taxpayers Union*, 302 F. App'x at 117.

The tailored allegations required by 42 U.S.C. § 1320b-10 are entirely different from the broad allegations in the State's first two claims here. The State's claims, and the trial court's ruling on those claims, are not based on specific, misleading representations in TVI's marketing. Instead, the trial court ruled that TVI violated the CPA, in large part, because charitable solicitations are a "ubiquitous" and "overwhelming" component of its marketing. CP at 1233, 1236; VTP (Nov. 8, 2019) at 120, 126. In other words, the State's broad allegations allowed TVI to be held liable for engaging in *too much* charitable solicitation. Liability under these circumstances clearly discourages charitable solicitations by other companies out of fear that they, too, might be accused of soliciting too much. In this way, the State's broad allegations "impermissibly chill protected speech." *Madigan*, 538 U.S. at 619.

Moreover, the State's broad allegations allowed the trial court to hold TVI liable for false impressions that were not created by TVI's marketing. The trial court found that there are public misconceptions about TVI's for-profit status because there are "few large for-profit thrift department stores." CP at 1184. These misconceptions exist "[a]*side from any advertising* that might occur," due to

32

"TVI's market position and business model." *Id.* (emphasis added). Although the State's CPA claims are not based on TVI's market position or business model, the trial court ruled that TVI violated the CPA, in part, for failing to "dispel" the public's misconceptions. *Id.* at 1234.

Dispelling public misconceptions is a central purpose of the CSA's disclosure requirements, which are the government's primary means of "prevent[ing] fraud" in charitable solicitations. *Madigan*, 538 U.S. at 623; *see* RCW 19.09.010(1)-(2). The trial court found, and the State does not dispute, that TVI makes all of the disclosures required by the CSA. Holding that TVI nevertheless violated the CPA because its charitable solicitations lacked additional, undefined disclosures would certainly "impermissibly chill protected speech." *Madigan*, 538 U.S. at 619.

Thus, the allegations supporting the State's first two claims are not properly tailored to target misleading affirmative representations as required by *Madigan*. As a result, these claims *cannot* result in liability without violating TVI's First Amendment rights. They must be dismissed.

        b.     The State's third claim is not supported by exacting proof

The final claim before us is based specifically on marketing that solicits on-site donations on behalf of the Rypien Foundation (Rypien). Unlike the State's first two claims, this claim makes specific, properly tailored allegations. However,

even under its own proposed "knew or should have known" standard, the State failed to support this claim with exacting proof.

Some additional background facts are necessary to analyze this claim. Rypien became one of TVI's Spokane-area charity partners in 2014, after a different charity partner ended its TVI contract. The initial contract between TVI and Rypien was unusual because it did *not* provide that TVI would pay Rypien a per-pound or per-item rate for donations. Instead, TVI paid Rypien a flat rate of $4,000 per month in exchange for the right to use Rypien's logo when soliciting donations.

This monthly rate "was calculated based on historic volumes" of donations in the Spokane area. CP at 1222. Thus, TVI's payments were intended "to compensate Rypien for its share" of donations and to "provide Rypien with predictable funds during the first year of the new relationship." *Id.* The parties' intentions were fulfilled; Rypien received almost exactly the same amount of money that it would have received under a standard contract ($40,000 over 10 months, compared to $39,129.29 over the same period based on per-pound rates). After their initial contract expired, TVI and Rypien transitioned to a standard, per-pound payment structure.

The State's final claim is based on marketing in which TVI used Rypien's logo to solicit donations during their initial contract period. *See* Exs. 468, 528,

34

573, 574, 692, 897, at 5. The State alleged that in doing so, TVI created the deceptive net impression that Rypien would be paid based on the amount of donations received, instead of a flat monthly rate. This allegation is far more specific than the allegations in the State's first two claims, discussed above, and satisfies *Madigan*'s requirement for "properly tailored" allegations. 538 U.S. at 619.

However, even by the State's own proposed standard, this claim is not supported by exacting proof. The State did not address what TVI "knew or should have known" in its trial brief or closing argument on this claim. Likewise, the trial court's ruling on this claim did not cite any evidence of what TVI knew or should have known. Instead, the trial court ruled for the State because "TVI knew what they were telling customers. They knew what the contract said. They knew or should have known the two were inconsistent and deceptive." CP at 1240.

An independent review of the record, as required by federal constitutional law, shows that this crucial finding was simply wrong. *See Kilburn*, 151 Wn.2d at 50-52. TVI's payments under its initial contract with Rypien were calculated to— and actually did—compensate Rypien for donations during the first year of its relationship with TVI. Moreover, donations collected during the initial contract period were used as "benchmarks" when TVI and Rypien negotiated a standard contract after the initial contract expired. CP at 349. Thus, Rypien *was* paid for,

*State v. TVI, Inc.*, No. 100493-1

and *did* benefit from, donations made at Spokane-area Value Village stores during its initial contract with TVI—just not under precisely the same structure that the State thinks it should have been.

The State presented no evidence at trial that TVI knew or should have known that using Rypien's logo could be deceptive and, on review, the State cites only the trial court's erroneous finding. As a result, even by the State's own proposed standard, its final claim is not supported by exacting proof. This claim must be dismissed.

CONCLUSION

For the above reasons, we hold that the State's CPA claims infringe on TVI's First Amendment right to engage in charitable solicitation. Therefore, we affirm the Court of Appeals in result. We remand to the trial court to dismiss the State's CPA claims and to rule on attorney fees and costs.

*State v. TVI, Inc.*, No. 100493-1

_____
Yu, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____
Gordon McCloud, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

37